## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**ANTHONY J. WOODS**                                    **CIVIL ACTION**

**VERSUS**                                                          **No. 20-482**

**LATOYA CANTRELL, ET AL.**                        **SECTION I**

### ORDER AND REASONS

Before the Court is a motion[1] to dismiss plaintiff Anthony J. Woods's ("Woods")

First Amended and Supplemental Complaint pursuant to Rule 12(b)(6) of the Federal

Rules of Civil Procedure filed by defendants LaToya Cantrell ("Cantrell"), Robert

Matthews ("Matthews"), Rhonda Sidney ("Sidney"), N'Gai Smith ("Smith"), Elizabeth

Robins ("Robins"), French Market Corporation ("French Market"), and the City of

New Orleans (the "City" and, with the previously named defendants, the

"defendants").[2]  Woods opposes[3] the motion, and the defendants submitted a reply[4]

---

[1] R. Doc. No. 28.  Woods's claims against Kathleen Turner ("Turner") were dismissed without opposition on December 23, 2020.  R. Doc. No. 48.
[2] The defendants originally indicated that the motion was made pursuant to both Rule 12(b)(1) and 12(b)(6).  *See, e.g.*, R. Doc. No. 28-2, at 1.  Throughout this litigation, they have alternatively disclaimed and asserted their argument that the Louisiana Civil Service Commission (the "Commission") has exclusive jurisdiction over certain state law claims—which was the basis of their 12(b)(1) argument.  *See, e.g.*, R. Doc. No. 31 (minute entry noting defense counsel's statement disclaiming that argument); R. Doc. No. 67, at 5 (defendants' supplemental brief explain that the pending Commission appeal "was" the basis of their 12(b)(1) argument and acknowledging the Court's jurisdiction to hear other claims).  Because the Court is dismissing all of Woods's federal claims and declining to exercise supplemental jurisdiction over his state law claims, it need not determine whether it *could* review them.
[3] R. Doc. No. 64 (replacement opposition).  Woods's newest opposition replaces the document filed by Woods's original counsel.  *See* R. Doc. No. 36 (original opposition).
[4] R. Doc. No. 73.

to that opposition, as well as a supplemental brief[5] ordered by the Court.  For the following reasons, the motion is granted in full, except as to his state law claims and Fourteenth Amendment claims, as well as those claims deemed not properly before the Court—those claims are dismissed without prejudice.

Resolution of this matter has been delayed significantly—first after Woods's belated retention of counsel, and then following his subsequent termination of that very same counsel.  While Woods has indicated to the Court that he has re-hired the same attorney he fired, she has not re-enrolled.

## I.

This case arises from Woods's employment with French Market[6] and his subsequent termination.  Woods's original *pro se* complaint raised a claim of racial discrimination in violation of Title VII, but included a statement that it was "brought to redress violation of" at least twenty-one other statutes, doctrines, and 'laws.'[7]  After Woods retained counsel and consent to proceed before the magistrate was withdrawn,[8] this Court conducted a status conference and ordered counsel to file an amended complaint to address the original complaint's deficiencies and ambiguities.[9]

---

[5] R. Doc. No. 67.  Woods did not respond to the request for supplemental briefing.  *See* R. Doc. No. 66.

[6] The defendants acknowledge that the French Market Corporation "oversees and operates the French Market properties that are owned by the City of New Orleans" and that "French Market Corporation Employees are members of the City of New Orleans classified system."  R. Doc. No. 28-2, at 2 n.3.

[7] R. Doc. No. 1, at 2 ¶ 3 (Woods's original complaint contains inconsistent numbering).

[8] R. Doc. No. 14 (granting Woods's motion to enroll Lena Hinton as counsel); R. Doc. No. 17 (notice of non-consent).

[9] R. Doc. No. 26.

Woods's "First Amended and Supplemental Complaint" purports to incorporate by reference "all previously pled allegations, and incorporates his original complaint as if copied in extenso,"[10] but adds a claim and clarifies others.[11]   The Court will rely on the factual allegations contained in both complaints, but not claims or factual allegations made for the first time in Woods's replacement opposition, filed a year after his original complaint.  *See Estes v. J.P. Morgan Chase Bank, Nat'l Ass'n*, 613 F. App'x 277, 280 (5th Cir. 2015) (finding that district court did not err in failing to consider factual allegations raised for first time in opposition because "when deciding a 12(b)(6) motion, a district court generally 'must limit itself to the contents of the pleadings, including attachments thereto'" (quoting *Brand Coupon Network, L.L.C. v. Catalina Marketing Corp.*, 748 F.3d 631, 635 (5th Cir. 2014))); *see, e.g.*, *Stewart v. Caton*, No. 13-823, 2013 WL 4459981, at *9 (E.D. La. Aug. 16, 2013) (Barbier, J.).[12]

Accepting all factual assertions in Woods's complaints as true,[13] the relevant facts are as follows.  Woods began working for French Market on April 1, 2013.[14]  He

---

[10] R. Doc. No. 27, at 1 ¶ 1.

[11] *Id.* at 1–4 ¶¶ 2–10.

[12] Woods, who has already amended his complaint once (at the Court's request) has not requested leave to amend his complaint again.  *See Stewart*, 2013 WL 4459981, at *9 ("[A] party must expressly request leave to amend." (internal quotation omitted)).  Nor is it obvious to the Court how Woods's understanding of the case might have changed between October 29, 2020, when he filed his first amended complaint, and February 2, 2021, when he filed his opposition.

[13] A difficult task, given the number of allegations contradicted either by the record or by other allegations.  And the task is made still more difficult by Woods's (and his former counsel's) hard-to-follow writing style.  The Court has given Woods ample opportunity to retain new counsel and to replace his old counsel's work.  But the matter must finally move forward.

[14] R. Doc. No. 1, at 3 ¶ 4.

was hired as a "laborer" but was eventually reassigned to work as a "painter."[15] Turner, French Market's Executive Director, assigned defendant Smith to supervise Woods,[16] empowering him to "discipline, suspend, [and] change [Woods's] work conditions."[17]

Woods claims that "prior incidents contributed to creating a hostile working environment towards him by staff members and employees."[18]  Smith "suspended [Woods] for ten days without reason" despite the fact that Woods "was the primary care provider for his terminally ill wife."[19]  Smith did so "on the basis that he was unable to locate" Woods.[20]  In reality, Smith was "not at work during the allege [sic] time [Woods] was missing."[21]  That suspension was later overturned by the Commission.[22]  Woods "reported his concerns to Sidney, [French Market's human resources director,][23] who failed to take any action on his behalf."[24]

According to Woods, defendants "Turner, Sidney, and Smith are very light skinned people who are bias [sic] and prejudice [sic] against him because he is dark skinned."[25]  French Market, "Turner, Sidney and Smith discriminated against

---

[15] *Id.*

[16] While unclear, it appears that Woods alleges both Smith and Matthews were, during the relevant period, his supervisors.  *See id.* at 4 ¶ 4.

[17] *Id.* at 3 ¶ 4.

[18] *Id.* at 8 ¶ 4.

[19] *Id.* at 9 ¶ 4.

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.* at 2 ¶ 2.

[24] *Id.* at 8 ¶ 4.  It is unclear how this is consistent with Woods's allegation that the Commission overturned the suspension.

[25] *Id.* at 9 ¶ 4.

[Woods] because of his color."[26]   French Market, "Turner and Sidney refused to promote" Woods because he is "a dark-skinned black man."[27]   Turner and Sidney treated "light-skinned employees . . . better than" they treated Woods.[28]

Woods also alleges that "Smith verbally and physically assaulted employees in the presence of others and was recommended to anger management training which did not deter his demeanor."[29]   "Smith [also][30] called [Woods] and another employee lazy shiftless N words in the presence of other employees[.]"[31]   "[A]nd neither Turner nor Sidney took any corrective action after being informed of the incident."[32]

Additionally, Woods "reported his religious convictions and practices to Smith and asked that his right to weekends office [sic] be recognized."[33]   When he did so, though, Smith "changed his work schedule to compel his [sic] to work on weekend [sic] performing other job duties besides painting."[34]   "Turner [and] Smith have

---

[26] *Id.*

[27] *Id.*

[28] *Id.*   Woods offers no evidence beyond this allegation that a similarly situated individual was treated differently—the only allegations that could conceivably be construed as describing such treatment concern treatment of Matthews and Smith, Woods's *supervisors.*

[29] *Id.*

[30] It is unclear from Woods's pleadings whether this allegation refers to the same incident as the allegation of verbal and physical abuse.  It is also unclear how, if so, Woods's allegation that French Market "recommended [Smith] to anger management training" is consistent with his allegation that French Market's Executive Director (Turner) and human resources director (Sidney) did not take "any corrective action." *Id.* at 9–10 ¶ 4.

[31] *Id.* at 10 ¶ 4.

[32] *Id.*

[33] *Id.* at 9 ¶ 4.

[34] *Id.*

scheduled weekends off for Matthews since the termination of his employment."[35] Moreover, while employed as a painter, Woods "was forced to work alone."[36] But after he was fired, French Market, Turner, and Smith "formed a paint crew to fulfill his job duties and responsibilities."[37]

Woods adds that "Turner authorized and commissioned Smith to harass him during his tenure of employment."[38] Turner also failed to take "corrective action to ensure his rights as an employee."[39] Moreover, the City, French Market, "Turner or Sidney knew of the violations going on or should have known of the violations going on, [and] had the power to prevent the violations[, but] chose not to prevent civil and criminal violations against him."[40]

On August 23, 2019, Woods was not scheduled to work, but came in to bring "his application for leave of pay" to Matthews, his acting supervisor.[41] Matthews was on the phone when Woods arrived.[42] Woods "entered . . . [Matthews's office] and placed the leave form on [Matthews's desk]" for processing.[43] The interruption enraged Matthews, who "threw the leave [form] on the floor."[44] Woods bent down to

---

[35] *Id.* at 10 ¶ 4.  The Court assumes Woods is referring to his own termination.  It is unclear, though, what role (if any) Smith plays in supervising Matthews.
[36] *Id.*
[37] *Id.* at 9 ¶ 4.
[38] *Id.* at 10 ¶ 4.
[39] *Id.*
[40] *Id.*
[41] *Id.* at 4 ¶ 4.  Woods describes this as "a protected activity"—though it is unclear in what sense.  *Id.*
[42] *Id.*
[43] *Id.*
[44] *Id.*

pick up the form, at which point he saw "Matthews . . . standing over him with a screwdriver in one hand and [a] radio in the other hand in an attack position."[45] Woods feared he would lose his life or suffer "bodily injuries."[46]  Acting on this fear, he "reflex reacted and subdued" Matthews "by grabbing his hand and pushing him against the wall."[47]  The incident ended as quickly as it began, and Matthews told Woods that he "thought [they] were playing."[48]  The two left the office together and rode the elevator upstairs to copy Woods's leave form, then returned, also using the elevator.[49]  Matthews did not report the incident to French Market security or Sidney, despite both being nearby.[50]

The same day, Turner sent Woods a notice of termination, alleging that he violated Civil Service Rule XI.1.1;[51]  Smith "never contacted" Woods regarding the firing.[52]  On August 26, 2019, Woods appealed his termination to the Commission.[53] On September 5, 2019, after a hearing was scheduled, Woods received a "Notification

---

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Id.*  Woods's complaint states that "he" never reported the incident, without specifying whether he is referring to himself or Matthews.  Common sense suggests Woods meant Matthews.

[51] *Id.* at 5 ¶ 4; *see* R. Doc. No. 28-3 (the original termination notice, appended to defendants' motion to dismiss).  The Court notes that it can consider this document in ruling on the 12(b)(6) motion.  *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000) ("not[ing] approvingly . . . that various other circuits" allow district courts to consider such documents "if they are referred to in the plaintiff's complaint and are central to [his] claim" as this assists both the plaintiff and the court).

[52] R. Doc. No. 1, at 5 ¶ 4.

[53] *Id.*

of Emergency Suspension and Notice of Pre-Termination Hearing,"[54] informing him that he was being suspended without pay for thirty days beginning August 29, 2019 and that a pre-termination hearing would be held September 11, 2019.[55]  Woods alleges that Turner drafted the document "informing after termination."[56]

At some point after Woods's initial termination, defendant Robins, an attorney for the City, "made contact with him . . . and solicited him to agree to" waive his appeal of his initial termination.[57]  She "refused to identify herself" while doing so, in an attempt to "disguise[] herself . . . and her representation of [French Market] and Turner . . . prior to completion of suspension date [sic] in attempt [sic] to correct the wrongful termination."[58]

On September 11, 2019, Robins "improperly influenced" the Commission to dismiss Woods's initial appeal as moot "on the basis [that] his termination was rescinded on September 5, 2019."[59]  She also prevailed on the Commission to "remove

---

[54] *Id.*  The complaint can be read to suggest that Turner drafted the second notice of termination on September 5, 2019 and Woods received it on September 20, 2019—though it is not clear why that would be, or how Woods would be aware of the gap. *Id.*

[55] *See* R. Doc. No. 28-5 (copy of notice appended to defendants' motion to dismiss).  As explained previously, the Court can consider this document. *See Collins*, 224 F.3d at 498–99.

[56] R. Doc. No. 1, at 5 ¶ 4.  It is unclear what this means.

[57] *Id.* at 6 ¶ 4.

[58] *Id.*  Woods does not explain how he learned of Robins's identity—or how her representation of the defendants was unclear during her alleged efforts to renegotiate his employment status on their behalf.

[59] *Id.*  The Court suspects this is a reference to a second letter sent by Turner to Woods on September 5, 2019, informing him that his previous termination had been rescinded and that he would be paid for the days he was scheduled to work prior to his suspension.  Defendants appended a copy of this letter to their motion to dismiss. R. Doc. No. 28-4.  And the sequence of events alleged by Woods is hard to understand

his appeal from the docket."[60]  She did so by emailing Stacie E. Joseph ("Joseph"), "requesting a continuance of the hearing set for appeal on October 24, 2019, due to City attorney mandatory in-service meeting."[61]  She also "fraudulently misrepresented to [Joseph] that appeal no. 9067 had been resolved on the basis of an agreement with [Woods] or withdrawal of [his] disciplinary action."[62]

On September 23, 2019, "Robins represented to [Joseph] that[] she would file [an] MSD[63] to [Woods's] appeal requesting removal of the appeal and [that] the matter be placed before the Commission when she file [sic] the MSD."[64]  However, she never filed the MSD.[65]

---

absent a rescission of his initial termination.  Why would a second termination be necessary?  However, the letter is not explicitly referenced in either complaint.  And the parties vigorously contest whether the initial termination was rescinded.  *See, e.g.*, R. Doc. No. 36, at 14 (Woods's opposition, stating that he "never conceded to being reinstated by [French Market] or being notified of a second termination").  Therefore, for purposes of the 12(b)(6) motion the Court can neither consider the document nor assume that Woods's initial termination was rescinded.

[60] R. Doc. No. 1, at 6 ¶ 4.

[61] *Id.*  Joseph's role and the sequence of events involving the Commission are both unclear from Woods's complaints.

[62] *Id.*  It is unclear to the Court how Robins's representation that the initial disciplinary action had been rescinded was fraudulent, as the record clearly indicates that the City rescinded the termination.  *See* R. Doc. No. 28-4 (September 5, 2019 letter notifying Woods that his termination had been rescinded and that he would be receiving backpay, submitted by the defendants as an exhibit).  However, the Court must accept Woods's allegation as true and cannot consider the contents of the defendants' exhibits that are not referenced in Woods's pleadings for purposes of this Rule 12(b)(6) motion.

[63] R. Doc. No. 1, at 6 ¶ 4.  Woods's complaint does not explain what an "MSD" is—or its significance to his claims.

[64] *Id.*

[65] *Id.*  It is unclear how the Commission could be misled into thinking a document *had* been filed with it.

After receiving a second termination letter, dated September 20, 2019,[66] Woods "was compelled to file a second appeal to [the Commission] to challenge the validity and veracity of the adverse employment action being imposed upon him by" the "conspiratorial, discriminatory, and unlawful employment practices" of Robins and Turner.[67]

On November 21, 2019, the Commission held a hearing on that appeal.[68] "During the hearing, it was ascertained that[] Turner and Sidney collaborated to file the notice of terminations predicated on their conjectures and perceptions of the event between Matthews and" Woods, and that neither they nor Smith had investigated the incident.[69] Matthews offered "conflicting testimony under oath" about the incident and the events that followed.[70]

Woods alleges that, this hearing and the pending ruling notwithstanding, the "defendants acted in concert to deprive and deny [him of] his freedom of speech to contest the allegations made against him."[71] They also "falsely and wrongfully terminated his employment without providing [him] a right to confront his accusers and evaluate the evidence against him" before he was fired.[72]

---

[66] R. Doc. No. 28-6 (second termination letter).
[67] R. Doc. No. 1, at 7 ¶ 4.
[68] *Id.* According to the parties, the Commission has not ruled on Woods's appeal.
[69] *Id.* While the Court *may* consider the transcript of this hearing provided by the defendants, it declines to do so, as the transcript's substance appears contested.
[70] *Id.*
[71] *Id.*
[72] *Id.*

Following the hearing, French Market management "celebrated by" announcing Woods's termination at "a group meeting at [a French Market] facility before the employees."[73]   Summarizing the sequence of events, Woods concludes that the defendants' "justification for his termination is pretextual" and that they "concocted a scheme falsely accusing [him] of criminal activities, summoned N.O.P.D. to arrest him,[74] and publicized and disseminated false statement [sic] with the knowledge of its falsity."[75] He explains that this conspiracy "constitutes [a] violation of Civil Service Rules and [French Market's] Employment policies" as well as a "violation of his civil liberty and right to freedom of speech and right to redress of his grievance in violation of" the First Amendment and Article I § 22 of the Louisiana Constitution.[76]

Woods adds that the defendants "failed to provide [his] procedural and substantive due process" and violated his right to equal protection under the 14th Amendment and Article I § 2 of the Louisiana Constitution.[77]

---

[73] *Id.*

[74] *Id.* at 8 ¶ 4.  Woods does not identify the point at which the police were called. Woods's opposition suggests that it happened when he returned to work on August 26, 2019.  R. Doc. No. 64, at 6.  But the Court cannot consider factual allegations raised for the first time in opposition to the motion.  *See supra.*

[75] R. Doc. No. 1, at 8 ¶ 4.

[76] *Id.*

[77] *Id.*  Because Woods makes no further argument in support of—and the defendants have therefore not offered any response—claims relating to equal protection and substantive due process, the Court will assume Woods is asserting only a procedural due process claim.  Woods's allegation, such as it is, is far too vague for the Court to do anything else.

After arguing that the City and French Market are responsible for the actions of their employees, Woods "contends that[] [French Market]'s Executive Director, Director of Human Resources and Staff Supervisor constitutes[78] an abuse of rights strictly deployed to cause injuries to his personal and property."[79]   In doing so, defendants "intentionally inflicted emotional distress on" Woods, causing him "mental anguish."[80]

Woods also concludes that "defendants acted in concert to retaliate against him because he exercised his protected right for work-place violations imposed on him by Turner, Smith and now Matthews."[81]   He "contends that[] defendants acted in concert and conspired to terminate his employment."[82]   Finally, Woods argues that Robins's conduct is unethical and is a violation of Louisiana's Professional Code of Conduct.[83] And he adds that, because of the ongoing Commission proceedings, the "defendants' actions are continuous requiring [the Court's] intervention" and that "without court intervention[,] social, economic, personal and property damages suffered as a result of defendants['] violation[s] against [him] will perpetuate."[84]

Woods's original complaint sets forth a claim of racial discrimination under Title VII and 42 U.S.C. § 1981, claiming that the defendants unlawfully terminated

---

[78] The Court interprets this, based on the context, to mean 'perpetrated'—though Woods's exact point is unclear.
[79] *Id.* at 11 ¶ 4.
[80] *Id.*
[81] *Id.* at 10 ¶ 4.
[82] *Id.*
[83] *Id.* at 11 ¶ 4.
[84] *Id.*

him, retaliated against him, failed to promote him, and perpetuated a hostile work environment.[85]  It also alleges that Woods exhausted his administrative remedies with the EEOC and received a right to sue letter in EEOC charge No. 461-2019-02807.[86]

Woods's amended complaint adds the following allegations:

Woods "applied for a supervisory position with French Market [and] was qualified for the position, but the entity refused to promote him . . . . French Market's hiring practice was such that White, light-skinned, and Hispanic employees were treated more favorably than dark skinned and Black employees."[87]  Woods "was denied promotional opportunities for which he was qualified."[88]  Woods adds that he "was classified as a painter and assigned to work solely as a 'one-man crew' on weekdays and as a maintenance technician on weekends" and that this "contravene[d] La. Rev. Stat. 23:332."[89]

Woods also adds a claim that he "was a civil service employee with a protected right and interest in his job position entitling him to a grievance process prior to termination, but was denied his protected right by" the defendants, except the City.[90]

Additionally, Woods adds to his original prayer for relief that he "exercised his freedom of speech by reporting to [Sidney] that[] [Turner] delegated authority to

---

[85] *Id.* at 11–12 ¶¶ 5–7.
[86] *Id.* at 12 ¶ 7.
[87] R. Doc. No. 27, at 2 ¶ 3.
[88] *Id.*
[89] *Id.*
[90] *Id.* at 2 ¶ 4.

[Smith] to monitor his activities and fire him for any reason."[91] "The administration and management targeted [Woods] without justification and retaliated by wrongfully terminating his job position."[92] Woods claims that this action by Turner, Sidney, and Smith violated his "protected rights under the First Amendment, 42 U.S.C. §§ 1983 and 2000e-3."[93]

Woods also alleges that he "was terminated for committing a criminal act on the job site" and that therefore, by terminating him in the way they did, "under the U.S. Constitution 14th Amendment Due Process Clause, defendants deprived and denied his protected constitutional right to confront his accuser and obtain evidence of his charges prior to terminating his employment with [French Market]."[94] He adds that "he was entitled to a grievance process prior to termination, but was deprived of his right by individuals operating under color of law prior to taking adverse employment actions against him . . . . [and] deprived plaintiff of his job and fringe benefits without due process of law."[95]

Woods also claims that, in violation of "42 U.S.C. 1985(3) . . . [Turner, Sidney, Robins, and Smith] had an agreement of mind to conspire and collude to unlawfully terminate" Woods's employment.[96] They did so by "conduct[ing] esoteric and ex parte meetings and communications with each other, [Matthews] and another employee

---

[91] *Id.* at 2 ¶ 5.
[92] *Id.* It is unclear from the amended complaint what provoked this 'retaliation.'
[93] *Id.* at 2–3 ¶ 5.
[94] *Id.* at 3 ¶ 6.
[95] *Id.*
[96] *Id.* at 3 ¶ 7.

without [Woods's] knowledge, fabricat[ing] and disseminat[ing] false notice of termination letters[97] presumptively accusing him of criminal assault on his supervisor[] [and] terminating his employment."[98]  They also "improperly influenced [the Commission] to cancel [Woods's] original complaint filed with the Commission to redress his grievances."[99]

Woods's amended complaint also adds allegations in support of his Title VII claim.  He "contends that, during his tenure of employment, he applied for a supervisory position (maintenance supervisor) with [French Market], for which he was qualified."[100]  However, French Market's "administrators and managers" refused to promote him.[101]  By way of comparison, Woods alleges that Smith, who "was an inventory clerk" was "hired or promoted to Head Supervisor without sufficient credentials or experience for the job position."[102]  Woods claims that this was the result of French Market's discriminatory practices, which favor "White, light skinned and non-black employees."[103]  He adds, without further explanation, that "he was treated differently from similarly situated employees because of his race/color."[104]

---

[97] The record (and common sense) suggests that the letters were not, in fact, "fabricated;" indeed, the fact that Woods was terminated is the basis of the instant litigation.  Nor is it clear how an entity could fabricate a letter terminating an employee.  Is Woods suggesting he was not actually fired?

[98] *Id.*

[99] *Id.* at 4 ¶ 7.

[100] *Id.* at 4 ¶ 8.

[101] *Id.*

[102] *Id.*  Unsurprisingly, Woods offers no explanation for his allegation that Smith was unqualified.

[103] *Id.*

[104] *Id.*

Woods adds a cause of action that he describes as "Harassment and Hostile Work Environment."[105]  In support of this claim he alleges that, while employed by French Market, he "was compelled to file multiple complaint[s] with [the Commission] for illegal suspensions charged against him by [Smith] and [Turner] with the approval of [Sidney]."[106]  He adds that he "successfully prevailed on all complaints filed against him."[107]  Additionally, "while performing in the course and scope of his job duties[, he] was monitored and criticized for his work performance as being sloppy by [Turner]."[108]  He was also "called a 'Lazy Monkey A__ N_____' by [Smith] in the present [sic] of co-workers on the job site without corrective action or disciplinary action taken against him."[109]  Smith also "physically assaulted co-workers in the present [sic] of other employees and [Sidney], who failed to take disciplinary actions against him."[110]  "Smith continued his abusive behavior against [Woods] due to his favored position with management as he fabricated and falsified criminal charges against Woods,[111] and obtained the assistance of [Robins] and approval from [Turner] to terminate his employment."[112]

---

[105] *Id.* at 4 ¶ 10.

[106] *Id.*

[107] *Id.*

[108] *Id.* at 5 ¶ 10.

[109] *Id.*

[110] *Id.*

[111] Again, Woods does not explain what these criminal charges were.

[112] *Id.*  The Court notes that this directly contradicts Woods's claim in his initial complaint that *Turner and Matthews* terminated Woods *without consulting Smith*.

Smith also "subjected [Woods] to intimidating and threatening employment tactics in structuring his work schedule."[113]   Smith told Woods "that[] he was purposefully trying to harm him when he arbitrarily changed his work schedule to prevent Woods from participating in his religious practices to cause harm to him and his severely infirm wife."[114]

For his part, Matthews "falsified facts of the incident" that led to Woods's firing.[115]  Specifically, Matthews "failed to disclose that . . . he threw [Woods's] leave document on the floor, . . . was on a personal call engaged in a heated dispute . . . [and] put down his phone and picked up a screwdriver and radio while [Woods] was bent over picking up the leave form."[116]  Woods re-alleges that he, acting "in self-defense, restrained [Matthews] to protect himself from harm."[117]  He adds that "[d]uring the [Commission] hearing, [Matthews] testified under oath admitting he had a radio but omitted knowledge of two notice of termination letter [sic] executed by [Turner] (drafted by [Sidney] with assistance from [Robins])."[118]

## II.

Pursuant to Rule 12(b)(6), a district court may dismiss a complaint or part of a complaint when a plaintiff fails to set forth well-pleaded factual allegations that "raise a right to relief above the speculative level." *See Bell Atl. Corp. v. Twombly*,

---

[113] *Id.*

[114] *Id.*  The Court notes that this contradicts Woods's claim in his original complaint that his schedule changed when his role changed.

[115] *Id.*

[116] *Id.*

[117] *Id.*

[118] *Id.*

550 U.S. 544, 555 (2007); *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007). The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 547).

A facially plausible claim is one in which "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* If the well-pleaded factual allegations "do not permit the court to infer more than the mere possibility of misconduct," then "the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)) (alteration in original).

In assessing the complaint, a court must accept all well-pleaded facts as true and liberally construe all factual allegations in the light most favorable to the plaintiff. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). Furthermore, "the Court must typically limit itself to the contents of the pleadings, including attachments thereto." *Admins. of the Tulane Educ. Fund v. Biomeasure, Inc.*, 08-5096, 2011 WL 4352299, at *3 (E.D. La. Sept. 6, 2011) (Vance, J.) (citing *Collins*, 224 F.3d at 498). "Dismissal is appropriate when the complaint 'on its face show[s] a bar to relief.'" *Cutrer v. McMillan*, 308 F. App'x 819, 820 (5th Cir. 2009) (quoting *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986)) (alteration in original).

### III.

The Court has identified numerous claims in Woods's amended complaint; the Court will set forth the law, arguments, and analysis for each claim in turn. First,

though, a word regarding the ongoing proceedings before the Commission. The defendants have intermittently argued that this Court is without jurisdiction to hear some of Woods's state law claims because the Commission has exclusive jurisdiction. Even though this argument is jurisdictional, the Court need not reach it. That is because the Court dismisses all of Woods's federal claims, and, in the absence of any remaining federal claims, declines to exercise supplemental jurisdiction over Woods's state law claims under 28 U.S.C. § 1367.[119]

This leaves Woods with the following claims:[120]

1.    Title VII race discrimination based on Woods's termination, and French Market's failure to promote him, and a hostile work environment.[121]

2.    Race discrimination in violation of 42 U.S.C. § 1981 based on his termination.

3.    Religious discrimination and retaliation under Title VII.

4.    Violations of the First Amendment related to his termination, brought under 42 U.S.C. § 1983, with the individual defendants sued in both their individual and official capacities.

---

[119] Separately, as explained *infra*, though, it concludes that Woods's federal procedural due process claim is not ripe because of the ongoing Commission proceedings.

[120] Woods's original complaint also included references to a number of Louisiana torts, including slander and intentional infliction of emotional distress. These claims do not appear to have been reasserted in the amended complaint and were not addressed in the motion to dismiss. To the extent Woods is still asserting them, the Court declines to exercise supplemental jurisdiction under 28 U.S.C. § 1367.

[121] Woods's replacement opposition appears to raise a Title VII/§ 1981 retaliation claim, though it is unclear what for. R. Doc. No. 64, at 19–21. This is the first time Woods has asserted such a claim (though he has raised a First Amendment retaliation claim). Such a claim cannot be raised in an opposition memorandum, and certainly not one filed months after an amended complaint. The Court has given Woods ample opportunity to amend; he has not availed himself of it. His Title VII/§ 1981 retaliation claims will be dismissed without prejudice.

5.     Violations of the Fourteenth Amendment related to his termination, brought under 42 U.S.C. § 1983.

6.     A conspiracy in violation of 42 U.S.C. § 1985.

### A.  *Title VII Race Discrimination*

Woods alleges that the defendants discriminated against him in violation of Title VII by (1) terminating him; (2) failing to promote him; and (3) perpetrating a hostile work environment.

### 1.  *Administrative Exhaustion*

Before reaching the merits of Woods's Title VII claims, the Court notes that his failure-to-promote claim must be dismissed for failure to administratively exhaust.

"Title VII requires employees to exhaust their administrative remedies before seeking judicial relief." *McClain v. Lufkin Indus.*, 519 F.3d 264, 273 (5th Cir. 2008). "Exhaustion occurs when the plaintiff files a timely charge with the EEOC and receives a statutory notice of right to sue." *Ganheart v. Brown*, No. 17-43, 2017 WL 3991182, at *2 (E.D. La. Sept. 11, 2017) (Africk, J.) (quoting *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378–79 (5th Cir. 2002)).  The Court "lacks subject matter jurisdiction over any claims for which plaintiff did not exhaust his administrative remedies." *Ekaidi v. Bd. of Supervisors of the S. Univ. Sys.*, No. 16-7523, 2017 WL 699821, at *2 (E.D. La. Feb. 22, 2017) (Africk, J.) (citing *Tolbert v. United States*, 916 F.2d 245, 247 (5th Cir. 2002)).  "'Each incident of discrimination and each retaliatory adverse employment decision' constitutes a separate actionable 'unlawful

employment practice' for which administrative remedies must be exhausted." *Id.* (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)) (alteration omitted).  "Each discrete act—such as 'termination, failure to promote, denial of transfer, or refusal to hire'—must be timely challenged and exhausted before the Court will consider that act as the basis for an independent claim." *Id.* (quoting *Morgan*, 536 U.S. at 114)).  These discrete acts are typically "easy to identify" in an EEOC charge. *Brooks v. Firestone Polymers, LLC*, 70 F. Supp. 3d 816, 837 (E.D. Tex. 2014) (quoting *Morgan*, 536 U.S. at 114).

"Courts should not condone lawsuits that exceed the scope of EEOC exhaustion, because doing so would thwart the administrative process[.]" *McClain*, 519 F.3d at 273.  However, "the scope of an EEOC charge should be liberally construed for litigation purposes" because Title VII was designed to protect laymen. *Id.* (citing *Sanchez v. Standard Brands, Inc.*, 519 F.2d 455, 465 (5th Cir. 1970)). Therefore, courts in the Fifth Circuit attempt to construe administrative charges in terms of the investigation that can reasonably be expected to grow out of them. *See id.* However, if the EEOC charge fails to mention the relevant facts, courts cannot consider the claims. *See Brooks*, 70 F. Supp. 3d at 842.

Defendants acknowledge that Woods filed an EEOC charge[122] but note that it "fails to mention" that he was denied a promotion.[123]  Because of this, they argue, Woods is foreclosed from bringing the claim now.

---

[122] R. Doc. No. 1, at 15–17 (notice of right to sue and original charge).
[123] R. Doc. No. 28-2, at 9.

Woods's opposition is quite difficult to understand, but it does offer a conclusory statement that he "exhausted his administrative remedy [sic] prior to seeking court intervention with EEOC and received a letter of right to sue."[124]  It offers no other argument that could be construed as responding to the defendants' administrative exhaustion claim regarding his promotion claims.

Woods's EEOC charge neither mentions that he was denied a promotion nor alludes to the facts that would support such a claim.[125]  Because of this, the failure to promote claim must be dismissed.

2.  *Merits – Title VII Disparate Treatment and Hostile Work Environment*[126]

Disparate Treatment

Both Woods and the defendants analyze the sufficiency of his Title VII claims under the burden shifting analysis prescribed by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), for cases in which a plaintiff relies on circumstantial evidence.[127] While the Court will accept this as an acknowledgment from Woods that his evidence is circumstantial, not direct, it must conclude that the parties are applying the wrong

---

[124] R. Doc. No. 64, at 6.

[125] R. Doc. No. 1, at 15–17.

[126] The Court notes that *Woods* acknowledged in his opposition that (as the defendants argue) Title VII claims cannot be raised against employees, only employers.  R. Doc. No. 64, at 23.  That is largely true.  *See, e.g.*, *Zeng v. Texas Tech Univ. Health Science Center at El Paso*, 836 F. App'x 203, 208 (5th Cir. 2020) ("[A] Title VII suit against an employee is actually a suit against the corporation.") (quoting *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 262 (5th Cir. 1999)). Because Woods has also sued French Market and the City, the Court will continue with its analysis of his claims on the merits.

[127] R. Doc. No. 28-2, at 7–8 (setting forth that standard and arguing Woods failed to state a *prima facie* case); R. Doc. No. 64, at 17–18 (setting forth the same standard).

standard.  The Fifth Circuit has clearly stated that "a plaintiff need not make out a prima facie case of discrimination in order to survive a Rule 12(b)(6) motion to dismiss for failure to state a claim."  *Stone v. Louisiana Dep't of Revenue*, 590 F. App'x 332, 339 (5th Cir. 2014) (quoting *Raj v. Louisiana State Univ.*, 714 F.3d 322, 331 (5th Cir. 2013)).  However, Woods still must "plead sufficient facts on all of the ultimate elements of a disparate treatment claim to make his case plausible."  *Chhim v. Univ. of Texas at Austin*, 836 F.3d 467, 470 (5th Cir. 2016) (citing *Raj*, 714 F.3d at 331).  The appropriate question at the motion to dismiss stage is whether Woods "has 'pleaded factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Stone*, 590 F. App'x at 339 (quoting *Iqbal*, 556 U.S. at 678) (alteration omitted).

"The Fifth Circuit has explained [that] 'there are two ultimate elements a plaintiff must plead to support a disparate treatment claim under Title VII: (1) an adverse employment action, (2) taken against a plaintiff because of her protected status.'"  *Barthelemy v. CHS-SLE LAND, L.L.C.*, No. 19-10086, 2020 WL 3605931, at *6 (E.D. La. July 2, 2020) (Brown, C.J.) (quoting *Cicalese v. Univ. of Texas Med. Branch*, 924 F.3d 762, 767 (5th Cir. 2019) (internal quotations omitted)).

The scope of Woods's disparate treatment claim is unclear.  His opposition, however, focuses on his claims that the defendants discriminated against him by (1) failing to promote him[128] and (2) terminating him.[129]  The Court has already

---

[128] R. Doc. No. 64, at 17 ("[French Market] took adverse employment action firing him for an alleged criminal act[.]").
[129] *See, e.g.*, *id.* ("[Woods] was not promoted because of his race Black.").

dismissed his failure to promote claim because it was not exhausted.  The question, then, is whether he states a claim based on his termination.

The defendants apparently concede that termination is an adverse employment action for purposes of Title VII,[130] but they argue that Woods's claim fails because the complaints "do not include any allegation that he was replaced by someone outside of his protected class."[131]  His "conclusory allegations that he was treated less favorably than other white, Hispanic and light-skinned employees . . . . fail to articulate the requisite amount of detail . . . to meet the pleading standard for a Title VII racial discrimination claim."[132]

Woods has clearly alleged an adverse employment action—his termination.  And, as explained, defendants are incorrect that he must, at this stage, allege that he was replaced by someone outside his protected class.  That is simply one way of establishing that defendants' reasons for the termination were discriminatory.

However, the defendants are correct that, aside from conclusory allegations that "defendants conspired and colluded to unlawfully terminate his employment on the basis of his race/color,"[133] the complaints lack any facts from which the Court might "draw the reasonable inference that the defendant is liable for the misconduct alleged."  *See Stone*, 590 F. App'x at 339 (quoting *Iqbal*, 556 U.S. at 678).  Woods's allegations about the defendants' failure to promote him (arguments which are,

---

[130] They are correct.
[131] R. Doc. No. 28-2, at 10.
[132] *Id.*
[133] R. Doc. No. 27, at 4 ¶ 7.

themselves, largely conclusory) are unrelated to his termination, which Woods acknowledges occurred following a workplace scuffle. His allegation that defendants Turner, Sidney and Smith "are very light skinned people who are bias[ed] and prejudice[d] against him because he is dark skinned" is conclusory.[134] And, while Woods alleges that Smith directed a reprehensible racial epithet in the presence of co-workers, no reasonable person could conclude from this alone that the individual defendants, French Market, and the Cty engaged in a conspiracy to fire him because he is "dark skinned." For this reason, Woods's disparate treatment claim fails.[135]

<u>Hostile Work Environment</u>

As noted above, *McDonnell Douglas* does not apply to Title VII claims at the motion to dismiss stage. *See Raj*, 714 F.3d at 331. Instead, "[t]o state a claim for hostile work environment, a plaintiff must allege 'that an employer has created a working environment heavily charged with . . . discrimination.'" *Conner v. Orleans Parish Sheriff's Office*, No. 19-561, 2019 WL 4393137, at *3 (E.D. La. Sept. 13, 2019) (Barbier, J.) (quoting *Raj*, 714 F.3d at 330–31) (internal quotation omitted). "In determining whether a workplace constitutes a hostile work environment, courts must consider the following circumstances: the frequency of the discriminatory

---

[134] R. Doc. No. 1, at 9 ¶ 4. Woods's complaint includes a number of similarly conclusory allegations of racial bias.

[135] Woods's supplemental opposition adds allegations that defendant Smith was not fired despite assaulting and battering a coworker, presumably in an effort to identify a comparator for purposes of Title VII. R. Doc. No. 64, at 17. Setting aside the obvious ways in which Smith, Woods's supervisor, is ill-suited to be a comparator for purposes of Title VII, allegations raised for the first time in an opposition are not properly before the Court for purposes of a 12(b)(6) motion. *See supra*.

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Whitlock v. Lazer Spot, Inc.*, 657 F. App'x 284, 287 (5th Cir. 2016) (per curiam)).

The defendants argue that Woods has failed to establish a *prima facie* claim of a hostile work environment based on race because the "one sentence in the complaint where [Woods] was subjected to being called a racial epithet" offers "no specific details or facts . . . regarding this allegation including that the harassment affected a term, condition or privilege of [Woods's] employment."[136]   The defendants also point out that offensive utterances alone cannot establish hostile work environment claims.[137]

In opposition, Woods argues that he has stated a hostile work environment claim because (1) Turner targeted him for termination and "compelled [him] to function in separate discipline as a painter and maintenance man without pay differential without weekends off;"[138] (2) he was "compelled to tolerate racial epithets by [Smith];"[139] (3) "falsely accused of stealing time and suspended by [Smith];"[140] (4) "denied right to file job related grievances against [Turner and Smith] by [Sidney];"[141] and (5) harassed by virtue of "[Robins] disguising her identity fabricating and falsifying a rescind agreement with [Woods]."[142]  Woods adds that he perceived this

---

[136] R. Doc. No. 28-2, at 11.

[137] *Id.* at 11–12 (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986)).

[138] R. Doc. No. 64, at 22.

[139] *Id.*

[140] *Id.*

[141] *Id.*

[142] *Id.*

conduct as offensive and that it was "motivated by the fact that [he] is Black / light skinned."[143]  He also claims that Turner, Sidney, and Smith's conduct "was [so] severe and pervasive that co-workers were offended by the mistreatment."[144]

In reply, the defendants point out that the only allegation related to hostile environment included in either of the complaints that involved obviously racially-motivated conduct was the use of a single racial epithet by Smith.[145]  They also argue that the new allegations do not appear related to race in any way but rather, take "issue . . . with the management and work schedule structure of [French Market]."[146]

Once again, the defendants' assertion that Woods must put forth a *prima facie* case is incorrect.  They are also incorrect that Woods's allegation regarding the racial epithet he was subjected to was conclusory.  His amended complaint details the substance of the epithet, when it was uttered, and provides relevant context (that

---

[143] *Id.*  The Court is confused by this, as it understands the gist of Woods's bias arguments to be that *the defendants* are "very light skinned people" who dislike him because he is "dark-skinned."  R. Doc. No. 1, at 9 ¶ 4.  Or perhaps because he is "black," *id.*, though this is confusing because his EEOC charge alleges that *Turner* is "Black."  *Id.* at 16.

Relatedly, the Court observes that, though the parties have treated this as a 'race discrimination' claim, it is better thought of as a 'color discrimination' or 'race/color discrimination' claim, in light of Woods's arguments that *skin tone* motivated the discrimination he experienced.  The Fifth Circuit has acknowledged Title VII claims based on 'color discrimination,' *see Khalfani v. Balfour Beatty Communities, LLC*, 595 F. App'x 363, 365 (5th Cir. 2014) (affirming summary judgment but recognizing a claim of "race/color discrimination"), though the point is academic because Woods's claims fail for other reasons.

[144] R. Doc. No. 64, at 22.

[145] R. Doc. No. 73, at 6.

[146] *Id.* at 6–7.

27

coworkers heard and that Smith was not reprimanded).  That is not the stuff of a conclusory allegation.

However, the defendants are correct that a single utterance of a racial epithet, despicable as it is, cannot support a hostile work environment claim.  *See, e.g.*, *Curry v. Lou Rippner, Inc.*, No. 14-1908, 2015 WL 2169804, at \*4 (E.D. La. May 8, 2015) (Brown, J.) ("[C]ourts in the Fifth Circuit have dismissed similar claims under Rule 12(b)(6) where the only perceived conduct alleged in the complaint was a single incident or offensive remark." (citing cases)); *see also Mosley v. Marion Cnty.*, 111 F. App'x 726, 728 (5th Cir. 2004) (finding three uses of racial slurs insufficient to survive summary judgment).  And the only other allegations in either complaint that seem conceivably tied to Woods's claim of a hostile work environment based on race is that (1) "Smith . . . continued his abusive behavior against" Woods;[147] (2) that Turner monitored Woods's work and called it "sloppy;"[148] and (3) that Woods was "compelled to file multiple complaints . . . for illegal suspensions charged against him by [Smith and Turner] with the approval of [Sidney].[149]  The first of these allegations is too vague to be helpful—what abusive behavior?  And the second and third offer no hint of an unlawful hostile work environment based on Woods's color or race, particularly given Turner and Smith's supervisory roles, Sidney's role as a human resources

---

[147] R. Doc. No. 27, at 5 ¶ 10.
[148] *Id.*  Woods also alleges that Smith physically assaulted other employees but does not explain how this was related to race or how it affected his employment, rendering it irrelevant.  *Id.*
[149] *Id.* at 4 ¶ 10.  Again, this seems directly at odds with Woods's assertions that Sidney prevented him from taking this action.

professional, and Woods's employment as a painter. Woods has not stated a claim of a hostile work environment.

### B. *Race Discrimination in Violation of 42 U.S.C. § 1981*

Woods's original complaint appeared to raise claims of race discrimination in violation of both Title VII and § 1981.[150]  While his amended complaint makes no mention of § 1981, his opposition argues that the defendants violated § 1981 by failing to promote him and by firing him.[151]  Defendants have construed Woods's complaints as an effort to state a claim arising from Woods's termination—though they acknowledge in their reply the possibility that Woods is now also attempting to raise his 'failure to promote' argument as a § 1981 claim.[152]  As explained *supra*, the Court will not allow Woods to assert new claims in his opposition.  Any § 1981 claim based on a 'failure to promote' is to be dismissed without prejudice to its being timely asserted in a subsequent action.

The Court will, however, address the claim arising from Woods's termination. As the defendants point out, the Fifth Circuit has repeatedly stated that the "analysis of employment discrimination claims under Title VII and § 1981 is 'identical,' because 'the only substantive differences' between the two statutes are 'their respective statutes of limitations and the requirement under Title VII that the employee exhaust administrative remedies.'" *Chen v. Oschner Clinic Found.*, 630 F. App'x 218, 227 (5th Cir. 2015) (quoting *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992

---

[150] R. Doc. No. 1, at 2 ¶ 3; *id.* at 11 ¶ 5.
[151] R. Doc. No. 64, at 16–18.
[152] R. Doc. No. 73, at 6.

(5th Cir. 2005).[153]   The Court concludes, therefore, that Woods's § 1981 claim regarding his termination fails for the same reasons his Title VII claim based on the same adverse employment action fails—because Woods has not offered anything but vague and conclusory allegations that his termination was race-based.

## C.   *Religious Discrimination Under Title VII and § 1981*

Woods's amended complaint contains numerous allegations that would appear to support a claim of religious discrimination under Title VII—but offers no hint as to the actual claim these allegations support.[154]   The defendants, referencing the original complaint, treated this allegation as potentially stating a claim under Title VII and § 1981.[155]   They argue (1) that Woods's EEOC charge makes no mention of religious discrimination, meaning he has not satisfied Title VII's exhaustion requirement[156] and (2) that § 1981 does not address religious discrimination.[157] Woods's opposition argues that he "exhausted his remedies and filed a complaint with EEOC alleging that[] he was aggrieved by unlawful employment practices of [the City

---

[153] There are some exceptions to this observation.  In a reply to Woods's opposition, the defendants identify one of them, pointing out for the first time that Woods cannot bring a § 1981 claim against the City and French Market, as well as the other defendants in their official capacities, because the statute does not provide a cause of action against local government entities independent of § 1983.  R. Doc. No. 73, at 2–3 (citing *Oden v. Oktibbeha Cnty.*, 246 F.3d 458 (5th Cir. 2001)).  While the Court is inclined to agree, it is disinclined to rule on an argument raised for the first time in reply against a plaintiff proceeding *pro* se at the time the reply was filed.  For this reason, the Court will not entertain the argument.

[154] R. Doc. No. 27, at 5 ¶ 10.

[155] R. Doc. No. 28-2, at 12.

[156] *Id.*

[157] *Id.* at 12 n.12.

and French Market]."[158]   Without explicitly acknowledging that his EEOC charge did

not reference religious discrimination, he argues that "[c]ounsel for defendant seeks

dismissal of Plaintiff religious claim on a technicality [for] . . . failure to exhaust

administrative remedy."[159]   He proceeds to accuse defense counsel of trying to

"circumvent justice" by raising a procedural defense.[160]

Woods's   EEOC   charge   makes   no   mention   whatsoever   of   religious

discrimination.   Therefore, any Title VII claim based on religious discrimination has

not been exhausted.   And § 1981 does not address religious discrimination.   *See Rhyce*

*v. Martin*, 173 F. Supp. 2d 521, 529 (E.D. La. 2001) (Clement, J.) ("[T]he great weight

of   authority   indicates   that   §   1981   applies   only   to   instances   of   racial

discrimination[.]"); *Manzanares v. Safeway Stores, Inc.*, 593 F.2d 968, 971 (10th Cir.

1979) ("Section 1981 does not apply to sex or religious discrimination").   Therefore,

Woods cannot raise a claim regarding Smith's religious discrimination against him

under either statute.

### D.  *Conspiracy to Unlawfully Terminate Woods in Violation of § 1985(3)*

Woods alleges that the individual defendants "had an agreement of mind to

conspire and collude to unlawfully terminate [his] employment" in violation of 42

U.S.C. § 1985(3).[161]   He adds that they did this "on the basis of his race/color."[162]   In

support of the claim, Woods alleges that the individual defendants "conducted

---

[158] R. Doc. No. 64, at 23.
[159] *Id.* at 24.
[160] *Id.*
[161] R. Doc. No. 27, at 3 ¶ 7.
[162] *Id.* at 4 ¶ 7.

esoteric and ex parte meetings and communications with each other, Robert Matthews and another employee without [his] knowledge, fabricated and disseminated false notice of termination letters presumptively accusing him of criminal assault on his supervisor, [and] terminat[ed] his employment."[163]   Woods claims that they also "improperly influenced [the Commission] to cancel [his] original complaint filed with the Commission to redress his grievances."[164]

Section 1985(3) provides a private right of action to redress a conspiracy to deprive "any person or class of persons of the equal protection of the law, or of equal privileges and immunities under the law." 42 U.S.C. § 1985(3). "To state a cognizable claim under § 1985(3), [Woods] must allege that (1) a racial or class-based discriminatory animus lay behind the conspiracy and (2) the conspiracy aimed to violate rights protected against private infringement." *Horaist v. Dr.'s Hosp. of Opelousas*, 255 F.3d 261, 270 (5th Cir. 2001) (citing *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267–68 (1993)).  Specifically, Woods must allege that

> (1) the defendants conspired (2) for the purposes of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, and (3) one or more of the conspirators committed some act in furtherance of the conspiracy; whereby (4) another person is injured in his person or property or deprived of having and exercising any right or privilege of a citizen of the United States; and (5) the action of the conspirators is motivated by a racial animus.

*Id.* at 270 n.12 (quoting *Wong v. Stripling*, 881 F.2d 200, 202–03 (5th Cir. 1989)) (internal quotations omitted).  "It is well settled in the Fifth Circuit that 'mere

---

[163] *Id.* at 3 ¶ 7.
[164] *Id.* at 4 ¶ 7.

conclusory allegations of conspiracy cannot, absent reference to material facts, state a substantial claim of federal conspiracy.'" *Zuniga v. Masse Contracting, Inc.*, 290 F. Supp. 3d 581, 587 (E.D. La. 2017) (Milazzo, J.) (quoting *McAfee v. 5th Circuit Judges*, 884 F.2d 221, 222 (5th Cir. 1989)).  And "the operative facts of an alleged conspiracy under § 1985(3) must be pled with specificity." *Mays v. Bd. of Comm'rs Port of New Orleans*, No. 14-1014, 2015 WL 1245683, at *9 (E.D. La. Mar. 18, 2015) (Brown, J.); *Davis v. Hager*, No. 17-10118, 2018 WL 3642007, at *3 (E.D. La. Aug. 1, 2018) (Vance, J.) ("[C]onclusory allegations cannot support . . . claims . . . under . . . § 1985(3)."); *see also Priester v. Lowndes Cnty.*, 354 F.3d 414, 420 (5th Cir. 2004) (requiring specificity in allegations of a private citizen's involvement in a § 1983 conspiracy).

The provision "does not itself provide any substantive rights.  Instead, the rights, privileges, and immunities protected by § 1985(3) 'must be found elsewhere.'" *Roe v. Abortion Abolition Soc.*, 811 F.2d 931, 933 (5th Cir. 1987) (quoting *United Brotherhood of Carpenters, Local 610 v. Scott*, 463 U.S. 825, 833 (1983)).  And a "deprivation of a right created by Title VII cannot be the basis for a cause of action under § 1985(3)." *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 378 (1979); *see also Washington v. Atmos Energy Corp.*, No. 07-50296, 2007 WL 2493492, at *1 (5th Cir. Sept. 4, 2007) (per curiam) (applying *Novotny* to a § 1985(3) claim by a plaintiff who alleged a conspiracy after he was fired following a verbal dispute on the job).

The defendants argue that Woods has failed to adequately state a claim and that, even if his pleadings were adequate, he cannot use § 1985(3) to reach a violation of Title VII.[165]  Woods's opposition does not address these arguments or the claim.

Woods's claim fails because, even construed liberally, his complaints fail to offer anything more than a conclusory allegation that the conspiracy was directed at him "on the basis of his race/color."[166]  That is a legal conclusion that does not come close to the level of specificity required to support a federal conspiracy claim.  *See, e.g.*, *Mays*, 2015 WL 1245683, at *9.  And, as discussed in the context of Woods's Title VII and § 1981 claims, the mere fact that the alleged conspirators have a different skin-tone than Woods is not nearly enough for a jury to conclude Woods's termination was race or color-based.

Woods also fails to identify the source of the protected right that the conspiracy allegedly violated.  *See Roe*, 811 F.2d at 933.  And, construing Woods's filings liberally, he is alleging that he was fired based on his race, in violation of Title VII.[167]  But, a violation of Title VII cannot support a § 1985(3) claim.  *See Novotny*, 442 U.S. at 378.  For all these reasons, Woods's claim fails.[168]

---

[165] R. Doc. No. 28-2, at 17; R. Doc. No. 73, at 8.

[166] R. Doc. No. 27, at 4 ¶ 7.

[167] *Id.*

[168] Additionally, while not briefed by the parties, it seems *likely* that the fact the conspirators were all acting as employees of French Market and the City dooms the claim, though there are inadequate allegations in the record regarding the relationship of those two entities and the conspirators' employment status for the Court to determine this conclusively.  *See Conner*, 2019 WL 4393137, at *5 (concluding that, as agents of a single employer, alleged conspirators "constitute a single legal entity which is incapable of conspiring with itself for the purposes of § 1985(3)" (quoting *Hilliard v. Ferguson*, 30 F.3d 649, 653 (5th Cir. 1994))); *Notariano*

E.  *Retaliation in Violation of the First Amendment under § 1983*

Woods alleges that the defendants "violate[d] [his] protected rights under U.S. Constitution First Amendment 42 U.S.C. §§ 1983 and 2000e-3."[169]  Specifically, he "exercised his freedom of speech by reporting to [Sidney] that, [Turner] delegated authority to [Smith] to monitor his activities and fire him for any reason" and the defendants "retaliated by wrongfully terminating his job position."[170]

"To succeed in a First Amendment retaliation claim under § 1983, a public employee must show: '(1) he suffered an adverse employment action; (2) he spoke as a citizen on a matter of public concern; (3) his interest in the speech outweighs the government's interest in the efficient provision of public services; and (4) the speech precipitated the adverse employment action.'"  *Wilson v. Tregre*, 787 F.3d 322, 325 (5th Cir. 2015).  Furthermore, as to the individual defendants, Woods "must plead that the individual defendants' 'animus against [his] exercise of First Amendment rights is a link in the causal chain that [led] to [his] firing.'"  *Jones v. Hosemann*, 812 F. App'x 235, 239 (5th Cir. 2020) (per curiam) (quoting *Sims v. City of Madisonville*, 894 F.3d 632, 639 (5th Cir. 2018)) (alterations in original).  And, as to the municipal defendants, Woods must "show[] 'a policymaker; an official policy; and a violation of constitutional rights whose moving force is the policy or custom.'"  *Culbertson v.*

---

*v. Tangipahoa Parish Sch. Bd.*, No. 16-17832, 2019 WL 77236, at *3 (E.D. La. Jan. 2, 2019) (Milazzo, J.) (similar).

[169] R. Doc. No. 27, at 3 ¶ 5.

[170] *Id.* at 2 ¶ 5.

*Lykos*, 790 F.3d 608, 628 (5th Cir. 2015) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (quotation omitted)).

"In determining whether an employee was speaking as part of his duties or had stepped outside that role to speak as a citizen and thus receive First Amendment protection, [courts] consider 'factors such as job descriptions, whether the employee communicated with coworkers or with supervisors, whether the speech resulted from special knowledge gained as an employee, and whether the speech was directed internally or externally.'" *Johnson v. Halstead*, 916 F.3d 410, 422 (5th Cir. 2019) (quoting *Rogers v. City of Yoakum*, 660 F. App'x 279, 283 (5th Cir. 2016)). "[C]omplaints made up the chain of command about conditions in a workplace are often held . . . unprotected." *Id.* at 423 (citing *Gibson v. Kilpatrick*, 773 F.3d 661, 670 (5th Cir. 2014)).

The defendants do not assert any affirmative defense to the claims, instead arguing that Woods has not stated a claim because he has not alleged that any protected speech occurred.[171]  Woods does not respond to this argument in detail, arguing only that the factual allegations in his complaint "collectively support[] contravention of his freedom of Speech regarding unlawful employment practices of [French Market]."[172]  He explains that he "engaged in protected activity and requested a hearing with Human Resources and was denied."[173]

---

[171] R. Doc. No. 28-2 at 14.
[172] R. Doc. No. 64, at 25.
[173] *Id.*  The Court will look past the fact that this appears to explicitly contradict Woods's allegations, which are that he was retaliated against by the defendants *for*

Even construing Woods's filings liberally, he has not come close to stating a First Amendment retaliation claim.  To the extent any speech occurred, it was to a human resources professional about workplace conduct.  That is not speech as "a citizen on a matter of public concern."  *Wilson*, 787 F.3d at 325.[174]  And Woods does not compare his interest in the speech with the government's interest in efficiently providing services to the public—another required element.  *See id.*  This alone is enough to doom the claim.

F.   *Violation of Woods's Fourteenth Amendment Procedural Due Process Rights Under 42 U.S.C. § 1983*

Finally, Woods claims that the "defendants deprived and denied his protected constitutional right to confront his accuser and obtain evidence of his charges prior to terminating his employment with [French Market.]"[175]  He explains that "he was entitled to a grievance process prior to termination, but was deprived of his right by individuals operating under color of law prior to taking adverse employment actions against him."[176]  While the scope of his claim is unclear, it appears to relate both to his initial firing[177] and to alleged efforts by the defendants to "improperly influence[]"

---

*reporting his concerns to human resources.*  How could that be the case if he was never allowed to make a report?  R. Doc. No. 27, at 3 ¶ 5.

[174] At one point, Woods seemingly argues that bringing his "application for leave of pay" to Matthews was "protected activity."  R. Doc. No. 1, at 4 ¶ 4.  To the extent he intends this to support his First Amendment claim, it does not, for the same reasons his report (or non-report) to Sidney does not support a claim.

[175] R. Doc. No. 27, at 3 ¶ 6.

[176] *Id.*

[177] *Id.* ("The adverse employment action deprived plaintiff of his job and fringe benefits without due process of law.")

the Civil Service Commission to cancel his appeal of the original decision firing him.[178]

The parties have frustratingly resisted the Court's efforts to understand exactly what Woods's Fourteenth Amendment claim is about.  In the memorandum supporting the instant motion, despite arguing that Woods had failed to state a claim, the defendants concede that Woods's "allegations regarding the notice and adequacy of his pre-termination hearing could reasonably be construed as an attempt to allege a procedural due process violation."[179]  They then argue, however, that "the issue of whether [Woods] was given adequate notice of the . . . pre-termination hearing to satisfy the requirement of procedural due process is currently before the Commission."[180]   And they add, without any support, that the "Court has the discretion to delay ruling on this particular issue until after the Commission issues its decision and findings of fact."[181]

Confused by Woods's complaints and the defendants' motion, the Court ordered supplemental briefing on the scope of the issues before the Commission, whether the Court "can and should defer consideration of [these claims] by way of a stay or dismissal—and whether those claims are ripe for review."[182]

Woods did not comply with the order.  The defendants did—but did not address ripeness.  Instead, in a section titled "Abstention Doctrine," the defendants directed

---

[178] *Id.* at 4 ¶ 7.
[179] R. Doc. No. 28-2, at 15.
[180] *Id.*
[181] *Id.* at 15–16.
[182] R. Doc. No. 51, at 1–2.

the Court's attention to "a strikingly similar case" which "may aid [the] Court in determining whether a stay or dismissal of [Woods's] claims is or is not warranted."[183] The defendants also pointed out "that § 1983 claims do not require exhaustion of state administrative or judicial remedies."[184]

The Court asked the parties whether Woods's claims are *ripe*. It does not know why neither Woods nor the defendants saw fit to answer that question. Now, the Court must do so *sua sponte*.

The issue is made significantly more difficult because it is entirely unclear what Woods is alleging. Woods clearly claims that the defendants fired him without a proper grievance process,[185] which is hardly a novel claim for a public employee. But, confusingly, Woods seems to acknowledge (after contesting the point vigorously) that the defendants rescinded his termination, arguing instead that this is irrelevant because it happened only after Robins "disguised herself from [him] . . . in [an] attempt to correct the wrongful termination" during which she "solicited him to agree to waiver of his appeal to [the Commission]."[186] He adds that "Robins fraudulently misrepresented to [a Commission employee] that [Woods's appeal of the initial termination] had been resolved" by agreement.[187]   And the conspiracy seems to

---

[183] R. Doc. No. 67, at 9–10 (describing *Jackson v. St. Charles Parish Housing Auth. Bd.*, 441 F. Supp. 3d 341 (E.D. La. 2020) (Ashe, J.)).   The Court notes that the defendants also declined to offer an opinion on whether they thought abstention was appropriate in this case.
[184] *Id.* at 9 n.14.
[185] R. Doc. No. 27, at 3 ¶ 6.
[186] R. Doc. No. 1, at 6 ¶ 4.
[187] *Id.*

extend further, including parties not before the Court.  In his opposition, Woods seemingly argues that the defendants' recission of his initial termination is irrelevant because he "never conceded to being reinstated . . . or being notified of a second termination" and "it is ludicrous to imagine an agreement to reinstatement of employment on the basis of receiving two day pay and immediately followed by a thirty-day suspension."[188]  And he adds that (though they are not parties) both the Commission, because it "has not provided [him] with a report of the hearing examiner report from the inception to present date in violation of plaintiff due process,"[189] and defense counsel, because she "is engaged in encouraging and assisting her client in committing a fraud and criminal conduct to defame [his] character,"[190] are part of the conspiracy.

As best the Court can understand, Woods's claim is not that the initial termination violated his right to due process,[191] but rather that the defendants

---

[188] R. Doc. No. 64, at 8.

[189] *Id.* at 9.

[190] *Id.* at 26.

[191] Though the defendants appear to concede that, absent its recission, it would have run afoul of the requirement that a public employee receive some kind of hearing.  R. Doc. No. 28-2, at 14–15.  And, while not reviewable on a motion to dismiss, ample record evidence confirms that, with or without Woods's consent, the initial termination was rescinded and replaced with an emergency suspension followed by a second termination, with Woods receiving back-pay for the time in between terminations.

While the Court declines to convert this motion to one for summary judgment, given the limited fact discovery in this case, it notes that the Fifth Circuit has rejected that a rescinded, unlawful termination followed by a second, lawful one violated due process.  *See Thibodeaux v. City of Opelousas*, 250 F.3d 740, 740 (5th Cir. 2001) (per curiam) ("Although the City did fail to provide proper notice to the plaintiff prior to his first termination, they promptly rescinded that termination and instituted

tricked him into giving up his appeal of his first termination and subverted the ongoing Commission process regarding both terminations. The Court takes this as an argument that the ongoing Commission process suffers from numerous defects which, combined, mean that it runs afoul of the Fourteenth Amendment. Viewed another way, Woods's complaints might be alleging that because of the ways the defendants tampered with the Commission process, the initial termination violated his Fourteenth Amendment right to due process.

"The ripeness doctrine is 'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'" *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (quoting *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993)). "But, even in a case raising only prudential concerns, the question of ripeness may be considered on a court's own motion." *Id.* "Ripeness is a component of subject matter jurisdiction, because a court has no power to decide disputes that are not yet justiciable." *Lopez v. City of Houston*, 617 F.3d 336, 341 (5th Cir. 2010). "To determine whether claims are ripe, we evaluate (1) the fitness of the issues for judicial resolution, and (2) the potential hardship to the parties caused by declining court consideration." *Id.*

The first of these factors weighs strongly against reviewing Woods's procedural due process claim. The Court acknowledges that, as noted in *Jackson*, the existence of the ongoing Commission process would not, in and of itself, render Woods's claim

---

proceedings for termination, giving him both a pre-determination hearing and post-termination relief.").

nonjusticiable if it was limited to the fact of a wrongful termination.  *See Jackson*, 441 F. Supp. 3d at 354 ("Once such an employee is terminated without notice or an opportunity to respond, she has a . . . procedural pre-termination due-process claim, regardless of the availability of administrative appeals.").  It is also true that *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985), clearly indicates that the fact of eventual reinstatement does not always eliminate liability for an initial unlawful termination.  But the Commission process is an integral part of Woods's procedural due process claim.  And he does not argue that, though his termination was rescinded, he was damaged because he was not given backpay, or similar.[192] Instead, he alleges that the recission was part of an ongoing conspiracy to trick the Commission into rejecting his claims, explaining that the conspiracy is ongoing and "continuous."[193]  That distinguishes this case from *Jackson*; the Court cannot possibly rule on Woods's claim without, at the very least, evaluating the complete Commission record and ruling.  And the Commission's work is not done.

---

[192] His replacement opposition states, for the first time, that "[a]ccording to [French Market], [Woods] was given paid [sic] for two days accompanied with an immediate suspension of thirty-days without a hearing or pay . . . . [He] was not aware of any deposit of wage payments to this bank account for scheduled days by [French Market.]"  R. Doc. No. 64, at 26.  The Court will ignore the fact that the record (and common sense) clearly demonstrate that Woods participated in a hearing regarding at the very least his second termination—that hearing is the source of the pending appeal.  To the extent Woods's convoluted statement might be read to allege he was not actually paid for the two days between his first firing and its recission, it is inappropriate for such an allegation to be raised in a replacement opposition memorandum a year after filing.  This claim will be dismissed without prejudice—Woods will have an opportunity to be heard on it, should he wish to do so.
[193] R. Doc. No. 1, at 11 ¶ 4.

The Court must also address the second factor—to what degree declining to review the claim would work a hardship on the parties.  The defendants have explicitly invited the Court to delay ruling on the matter until the Commission process is complete; it would therefore be difficult to argue that they will be burdened by a dismissal without prejudice.

Woods did not respond to the Court's request that he brief whether it should delay ruling.  However, he was proceeding *pro se* at the time briefing was due; therefore, the Court will conduct an independent analysis.  Woods has brought this claim—it is obvious that he would like it ruled on now rather than later.  And, in the Court's eyes, he has every right to be frustrated by the Commission's failure to rule on his appeal—more than a *year* after it was filed.  But there is no hardship imposed by a dismissal because the Court cannot grant relief at this stage.  Woods's procedural due process claim is that the defendants conspired to rob him of a functional review of his termination.  He may be right; he may be wrong.  But the Court cannot address a claim about the fairness or adequacy of a review process that is ongoing.  Woods will be able to appeal an unfavorable outcome of his appeal in the Louisiana court system.  And he may be able to pursue his procedural due process claims when they become more than theoretical.  But, for the moment, his claims are not ripe for review; therefore, they must be dismissed.

## IV.

The Court has made every effort to identify and evaluate each of Woods's claims.  And it understands that he would like indefinite time to find new counsel.

43

But "judges are not pigs, hunting for truffles buried in briefs," and this case has languished long enough. *Baham v. McLane Foodservice, Inc.*, 431 F. App'x 345, 347 n.1 (5th Cir. 2011) (citation omitted). Therefore,

**IT IS ORDERED** that the motion is **GRANTED**, in that Woods's properly asserted federal law claims, except those raised under the Fourteenth Amendment, are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Woods's Fourteenth Amendment claims are **DISMISSED WITHOUT PREJUDICE** to being re-raised in an appropriate proceeding once ripe for adjudication.

**IT IS FURTHER ORDERED** that Woods's state law claims, and all federal claims the Court construed as improperly raised, or otherwise rejected because they were not properly before it, are **DISMISSED WITHOUT PREJUDICE**.

New Orleans, Louisiana, March 16, 2021.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**